**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **TROY HARRIS** | : | **Civil Action No.: 25cv1461** |
| | : | |
| **Plaintiff,** | : | |
| v. | : | |
| | : | |
| **ASHLEYMARIE CALDERON &** | : | |
| **DAVID CZEREMCHA** | : | |
| **Defendant** | : | September 5, 2025 |

# COMPLAINT

1. In August 2024, Connecticut correctional officer Ashleymarie Calderon falsely accused inmate Troy Harris of masturbating in front of her—a fabrication directly contradicted by surveillance footage showing no interaction between them at the alleged time. Despite three lieutenants confirming the video exonerated Harris, hearing officer David Czeremcha upheld the charge, claimed the footage supported Calderon's account, and introduced new allegations never documented in the disciplinary report. This prosecution followed a pattern: three years earlier, Calderon had lodged another false disciplinary charge against Harris after he criticized her treatment of inmates, resulting in his placement in segregation until supervisors intervened. These deliberate fabrications and the denial of due process represent unconstitutional conduct through the weaponization of prison disciplinary procedures resulting in unlawful suffering and warranting this Court’s intervention.

## JURISDICTION AND VENUE

2. This Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (jurisdiction over civil rights actions).

3. The claims arise under the Constitution and laws of the United States, specifically 42 U.S.C. § 1983.

4. Venue is proper in the District of Connecticut under 28 U.S.C. § 1391(b).

5. The events giving rise to these claims occurred at Corrigan Correctional Center in Montville, Connecticut.

6. Upon information and belief, Defendants reside in Connecticut and were employed there at all relevant times.

7. Mr. Harris filed a timely inmate grievance regarding the August 2024 incident on or about August 16, 2024.

8. Prison officials provided no response to this grievance.

9. Mr. Harris pursued a Level-2 grievance appeal based on the lack of response.

10. Prior to filing the grievance, Mr. Harris sought informal resolution by verbally notifying Unit Manager Lieutenant Hackett of the issue.

11. Lt. Hackett responded that the Deputy Warden was examining the matter.

12. Mr. Harris filed a formal disciplinary appeal by letter dated September 18, 2024, to District Administrator Craig Washington.

13. District Administrator Washington denied the appeal, stating the hearing officer's decision was "reasonable."

14. Mr. Harris has exhausted all available administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).

**PARTIES**

14. Plaintiff Troy Harris is an inmate of the Connecticut Department of Correction.

15. At all times relevant to this Complaint, Mr. Harris was incarcerated at Corrigan Correctional Center in Montville, Connecticut.

16. Mr. Harris brings this action to vindicate his constitutional rights under the First, Eighth, and Fourteenth Amendments.

17. Defendant Ashleymarie Calderon was, at all times relevant, a Correction Officer employed by the Connecticut Department of Correction.

18. Defendant Calderon was assigned to Corrigan Correctional Center during the relevant period.

19. Defendant Calderon is sued in her individual capacity.

20. At all relevant times, Officer Calderon acted under color of state law within the scope of her employment as a DOC correctional officer.

21. Defendant David Czeremcha was, at all times relevant, a Lieutenant employed by the Connecticut Department of Correction at Corrigan Correctional Center.

22. Upon information and belief, Lt. Czeremcha served as a Disciplinary Hearing Officer for inmate disciplinary proceedings.

23. Defendant Czeremcha is sued in his individual capacity.

24. At all relevant times, Lt. Czeremcha acted under color of state law within the scope of his duties as a DOC lieutenant.

**FACTUAL BACKGROUND**

**Mr. Harris's Protected Speech and Initial Retaliation (2021)**

26. In 2021, Plaintiff Troy Harris and Officer Calderon initially maintained a cordial rapport.

27. Mr. Harris observed Officer Calderon exhibiting abusive and harassing behavior toward other prisoners on the unit.

28. Mr. Harris exercised his First Amendment right to free expression by directly telling Officer Calderon that she was a "bully."

29. Mr. Harris stated to Officer Calderon that he "doesn't like bullies," thereby voicing his protest of her mistreatment of inmates.

30. This confrontation constituted protected speech concerning prison conditions and the treatment of prisoners.

31. Following Mr. Harris's criticism, Officer Calderon began to single him out for retaliation.

32. Officer Calderon started harassing Mr. Harris and interfering with his prison job assignments.

33. Mr. Harris held positions as a first-shift laundry worker and unit food server, which normally allowed him out of his cell to work.

34. Officer Calderon deliberately prevented Mr. Harris from attending his assigned work duties.

35. Officer Calderon instead allowed the second-shift worker to perform Mr. Harris's first-shift tasks.

36. Officer Calderon told Mr. Harris that it was "up to her" who she wanted to let work.

37. This arbitrary denial of work opportunities occurred without legitimate penological justification.

38. Rather than reacting aggressively to Officer Calderon's harassment, Mr. Harris requested to speak with mental health staff.

39. Mr. Harris feared that Officer Calderon's provocation would cause him to "flip out" or lose his temper.

40. Mr. Harris requested placement on Behavior Observation Status (B.O.S.) to be removed from the housing unit and away from Officer Calderon's antagonism.

41. Mr. Harris explained to mental health officials that Officer Calderon's behavior was triggering him.

42. Prison staff placed Mr. Harris in segregation on B.O.S. status despite his commission of no disciplinary infraction.

43. B.O.S. constitutes a form of mental health watch that should be initiated only for genuine psychiatric or safety reasons.

44. The use of B.O.S. to remove Mr. Harris from the unit without disciplinary charges or suicidal ideation constituted a misuse of this status.

45. While Mr. Harris was in segregation on B.O.S., Lieutenant Hackett and Lieutenant Pearson visited his cell.

46. These supervisors informed Mr. Harris they were attempting to ensure Officer Calderon would no longer be assigned to his unit.

47. The supervisors' response indicated acknowledgment that Officer Calderon's presence and conduct were problematic.

48. Mr. Harris was released from B.O.S. and returned to his unit after this intervention.

**November 2021 False Threat Allegation**

49. In November 2021, Officer Calderon returned to Mr. Harris's housing unit for a shift.

50. On or about November 9, 2021, while the prison was on "feedback" status and Mr. Harris was assisting with meal service, Officer Calderon began antagonizing Mr. Harris again.

51. Mr. Harris asked Officer Fuller to call the Mental Health department, indicating he could not remain in the unit with Officer Calderon.

52. Officer Calderon overheard or became aware of Mr. Harris's request for mental health assistance.

53. Officer Calderon then contacted the Lieutenants' office and falsely reported that Mr. Harris had "just threatened her."

54. Mr. Harris had not threatened Officer Calderon in any way.

55. Mr. Harris's only action was requesting mental health assistance to avoid confrontation.

56. Prison officials immediately placed Mr. Harris into the Restrictive Housing Unit based solely on Officer Calderon's report.

57. Officials issued Mr. Harris a Class A disciplinary ticket for "Threats" on November 9, 2021.

58. While Mr. Harris was in segregation, Lieutenant Pearson pulled him from his cell for questioning.

59. The next day, Lieutenant Pearson pressured Mr. Harris to plead guilty to the threat ticket.

60. Mr. Harris initially refused to admit to an act he did not commit.

61. Lt. Pearson offered to "defer" the disciplinary ticket, meaning the charge would be held in abeyance without immediate punishment.

62. Lt. Pearson represented this as a situation where "both sides win."

63. Under the stress of segregation, Mr. Harris reluctantly agreed to the deferred disposition.

64. After returning to his unit, Mr. Harris spoke with Lieutenant Hackett about the outcome.

65. Lt. Hackett informed Mr. Harris that he "should not have copped out" to the ticket.

66. Lt. Hackett revealed he had been working to get the unfounded ticket dismissed entirely.

67. Officer Pullen had informed a lieutenant that Mr. Harris did not threaten Officer Calderon.

68. This exculpatory witness statement from a fellow staff member corroborated Mr. Harris's innocence.

69. Had Mr. Harris known of Officer Pullen's statement earlier, he would never have agreed to the deferred discipline.

70. After the November 2021 incident, Lt. Hackett assured Mr. Harris that Officer Calderon would no longer work in his housing unit.

71. For a substantial period after 2021, Officer Calderon was kept away from Mr. Harris's unit.

**False Sexual Misconduct Allegation (August 2024)**

72. In mid-2024, Officer Calderon returned to duties on Mr. Harris's housing unit at Charlie Pod, Corrigan Correctional Center.

73. This assignment occurred despite earlier assurances that she would be kept away from Mr. Harris.

74. In August 2024, Officer Calderon worked the overnight Third Shift on Charlie Pod where Mr. Harris was housed.

75. This marked the first time since 2021 that Officer Calderon had direct supervisory contact over Mr. Harris.

76. At approximately 12:35 a.m. on August 4, 2024, Officer Calderon claimed Mr. Harris was standing at his cell door completely naked.

77. Officer Calderon alleged Mr. Harris was masturbating while staring at her as she toured the housing unit.

78. Officer Calderon reported that Mr. Harris was "stroking his penis" and looking directly at her.

79. Officer Calderon documented these claims in a Class A Disciplinary Report for sexual misconduct.

80. Officer Calderon's report asserted that between 12:15 a.m. and 12:35 a.m., Mr. Harris remained naked and engaged in this lewd act.

81. Mr. Harris had not engaged in the described behavior.

82. There had been no interaction or exchange between Mr. Harris and Officer Calderon at the time in question.

83. Upon information and belief, Mr. Harris was asleep or in his cell unaware of Officer Calderon's presence on duty.

84. Lieutenant Melendez, the supervising lieutenant on duty, responded to Officer Calderon's report.

85. Before taking action, Lt. Melendez reviewed the security camera footage from the prison's Verint video system.

86. The video footage covered the exact time and location of the alleged incident.

87. The video footage showed no interactions or exchanges whatsoever between Officer Calderon and Mr. Harris.

88. The camera did not show Officer Calderon stopping at Mr. Harris's cell.

89. The camera did not show Officer Calderon reacting as one would if witnessing an inmate masturbating.

90. The footage showed nothing out of the ordinary during the alleged timeframe.

91. Lt. Melendez had Officer Calderon relieved from her post following his review of the footage.

92. Lt. Melendez summoned Officer Calderon to the Lieutenants' Office for an explanation.

93. Lt. Melendez pointed out that the surveillance video showed no interaction between her and Mr. Harris.

94. Officer Calderon then adjusted her story, claiming she had "addressed the inmate" in passing while continuing her tier tour.

95. Officer Calderon stated she "did not want to view the fully naked inmate."

96. Officer Calderon admitted she never actually saw Mr. Harris masturbating.

97. Officer Calderon admitted she never clearly observed Mr. Harris in a state of undress.

98. This explanation fundamentally contradicted her disciplinary report, which explicitly stated Mr. Harris was masturbating and "looking at [her]."

99. Despite the video evidence negating Officer Calderon's account, officials proceeded with disciplinary action against Mr. Harris.

100. Officer Calderon completed the Class A Disciplinary Report for Sexual Misconduct.

101. Lt. Melendez prepared an incident report.

102. At approximately 1:00 a.m. on August 4, 2024, Lt. Melendez and another lieutenant went to Mr. Harris's cell.

103. They were accompanied by custody staff to carry out Mr. Harris's removal to segregation.

104. Officers instructed Mr. Harris to put on pants and shoes.

105. Mr. Harris asked why he was being removed from his cell.

106. Officers informed him that Officer Calderon had written a disciplinary ticket for sexual misconduct.

107. This was the first time Mr. Harris learned Officer Calderon was in the unit that night.

108. Mr. Harris immediately protested that the accusation was fabricated.

109. Mr. Harris told Lt. Melendez that Officer Calderon never looked into his cell.

110. Mr. Harris implored the Lieutenant to check the camera footage.

111. Lt. Melendez replied, "I already did so," acknowledging he had reviewed the video.

112. Despite this acknowledgment, Mr. Harris was ordered to submit to hand restraints.

113. Correctional staff placed Mr. Harris into the Restrictive Housing Unit pending a disciplinary hearing.

114. Once in the RHU, three different lieutenants explicitly told Mr. Harris they had reviewed the camera footage.

115. These lieutenants confirmed the footage clearly showed Officer Calderon never looked into his cell during the time in question.

116. Mr. Harris remained in isolated confinement for approximately five days, from August 4 until August 9, 2024.

117. During his RHU confinement, Mr. Harris was confined to a cell for at least 23 hours per day.

118. Mr. Harris was deprived of normal privileges and activities while in segregation.

119. When processed into RHU custody on August 4, 2024, Mr. Harris initially refused to answer routine medical screening questions.

120. In response, the attending Registered Nurse ordered that Mr. Harris be placed on Behavioral Observation Status in the RHU.

121. BOS status in RHU involves constant monitoring and reduced property, including limited clothing.

122. Mr. Harris had not threatened self-harm or expressed suicidal ideation.

123. The imposition of BOS because Mr. Harris remained silent during intake constituted a misuse of this clinical status.

124. On or about August 9, 2024, Mr. Harris was released from RHU and returned to his regular unit.

125. The false disciplinary charge remained pending against Mr. Harris.

**Disciplinary Hearing and Due Process Violations**

126. Mr. Harris's disciplinary hearing on the sexual misconduct charge occurred on or about August 15, 2024.

127. The hearing was conducted at Corrigan Correctional Center.

128. Defendant Lieutenant David Czeremcha served as the Disciplinary Hearing Officer.

129. During the hearing, Mr. Harris adamantly denied the sexual misconduct allegation.

130. Mr. Harris stated that Officer Calderon never looked into his cell window.

131. Mr. Harris argued that if Officer Calderon had looked, she could not have seen what she claimed.

132. Mr. Harris requested that the camera footage be reviewed and considered at the hearing.

133. Mr. Harris noted that if he were standing at his cell door, only his face and chest would be visible from outside.

134. Mr. Harris argued this fact made Officer Calderon's claim of seeing him naked and masturbating implausible.

135. Lt. Czeremcha asserted he had reviewed the camera footage.

136. Lt. Czeremcha claimed the video "matched" Officer Calderon's report.

137. Lt. Czeremcha stated the video showed Officer Calderon stopping at Mr. Harris's cell.

138. Lt. Czeremcha claimed Officer Calderon appeared to be saying something to Mr. Harris in the video.

139. This characterization directly contradicted what other DOC lieutenants had observed on the same footage.

140. Mr. Harris informed Lt. Czeremcha that "you are the only one that's saying that."

141. Mr. Harris told Lt. Czeremcha that three other lieutenants confirmed Officer Calderon did not look into the cell.

142. When Mr. Harris argued the charge did not constitute "Sexual Misconduct" under prison rules, Lt. Czeremcha introduced new allegations.

143. Lt. Czeremcha stated: "Well, Officer Calderon said that you had your mouth wide open making sex noises."

144. This claim about audible moaning or sexual sounds never appeared in Officer Calderon's disciplinary report.

145. The written report contained no reference to any noises or sounds.

146. Mr. Harris immediately objected that such information should have been included in the Disciplinary Report under DOC Administrative Directive 9.5.

147. The introduction of this surprise allegation violated basic due process principles requiring notice of charges.

148. Mr. Harris was not allowed to call as witnesses the lieutenants who had reviewed the video and found no wrongdoing.

149. Upon information and belief, the actual video was not played at the hearing.

150. Lt. Czeremcha has reportedly stated that "no C.O. will ever be a witness in any hearing [he] conducted."

151. At the conclusion of the August 15, 2024 hearing, Lt. Czeremcha found Mr. Harris guilty of Sexual Misconduct.

152. This finding was made despite the lack of credible evidence supporting Officer Calderon's accusation.

153. The finding was made in the face of affirmative evidence of innocence.

154. Lt. Czeremcha imposed disciplinary sanctions on Mr. Harris.

155. Upon information and belief, sanctions included punitive segregation deemed served by his August 4-9 RHU confinement.

156. Sanctions included loss of certain privileges.

157. The conviction resulted in a Class A disciplinary notation on Mr. Harris's prison record.

158. On or about September 18, 2024, Mr. Harris submitted a written appeal to DOC District Administrator Craig Washington.

159. Mr. Harris detailed the unfairness of the hearing and lack of evidence in his appeal.

160. District Administrator Washington denied the appeal.

161. Washington stated the Hearing Officer's finding was "reasonable based on information and evidence presented at the formal hearing."

162. Upon information and belief, the District Administrator did not independently review the video footage.

163. The appeal denial effectively rubber-stamped the outcome without addressing the injustice.

164. With the denial of his appeal, Mr. Harris fully exhausted the DOC's disciplinary appeal process.

**CLAIMS FOR RELIEF**

**Count I – First Amendment Retaliation (42 U.S.C. § 1983)**

**Against Defendant Ashleymarie Calderon**

165. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

166. The First Amendment guarantees prisoners the right to complain about prison conditions and petition for redress of grievances.

167. This protection encompasses an inmate's right to criticize prison officials' misconduct without fear of retribution.

168. Mr. Harris engaged in protected First Amendment conduct by verbally objecting to Officer Calderon's treatment of inmates.

169. Mr. Harris exercised protected speech by calling Officer Calderon a "bully" and stating his disapproval of her behavior.

170. Mr. Harris engaged in protected activity by filing grievances regarding Officer Calderon's false accusations.

171. Mr. Harris exercised his rights by seeking help from prison officials and mental health staff to address Officer Calderon's hostile conduct.

172. In November 2021, Officer Calderon falsely accused Mr. Harris of making threats immediately after he sought mental health assistance.

173. This false accusation resulted in Mr. Harris's placement in segregation on a baseless disciplinary charge.

174. In August 2024, upon being reassigned to Mr. Harris's unit, Officer Calderon fabricated a sexual misconduct charge without provocation.

175. Officer Calderon's pattern of false accusations demonstrates retaliatory animus stemming from Mr. Harris's protected speech.

176. The timing of Officer Calderon's actions strongly indicates retaliatory motive.

177. Officer Calderon's false disciplinary charges served no legitimate penological purpose.

178. These actions were taken with intent to silence and punish Mr. Harris for his protected speech.

179. Officer Calderon's conduct would deter a person of ordinary firmness from engaging in protected First Amendment activity.

180. As a direct result of Officer Calderon's retaliation, Mr. Harris suffered wrongful segregation, emotional distress, and chilling of his First Amendment rights, for which he is entitled to damages and injunctive relief to prevent further violations.

**Count II – Cruel and Unusual Punishment (Eighth Amendment)**

**Against Defendants Ashleymarie Calderon and David Czeremcha**

181. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

182. The Eighth Amendment prohibits the wanton infliction of pain or punishment on inmates.

183. This protection forbids actions done maliciously to cause harm rather than for legitimate penological objectives.

184. Officer Calderon deliberately falsified a sexual misconduct charge knowing it would result in Mr. Harris's immediate placement in punitive segregation.

185. Officer Calderon's false allegation served no penological purpose but was intended to hurt and punish Mr. Harris out of personal animus.

186. The deliberate misuse of prison disciplinary mechanisms to punish an innocent inmate constitutes unnecessary and wanton infliction of pain.

187. Mr. Harris was dragged from bed in the middle of the night, shackled, and confined in segregation for days.

188. Mr. Harris was placed on Behavioral Observation Status involving extreme deprivation including constant observation and reduced privileges.

189. Mr. Harris suffered these conditions without having committed any infraction.

190. Lt. Czeremcha, despite clear evidence of Mr. Harris's innocence, upheld the false charge and authorized punitive sanctions.

191. Lt. Czeremcha acted with deliberate indifference to the truth and to Mr. Harris's wellbeing.

192. Lt. Czeremcha's upholding of a baseless charge ensured Mr. Harris would carry the stigma of a Class A conviction.

193. The cumulative effect of Defendants' actions resulted in punishment grossly excessive to any conceivable legitimate purpose.

194. Officer Calderon's actions were intentional and exhibited a sadistic desire to cause harm.

195. Lt. Czeremcha's actions showed deliberate indifference to Mr. Harris's rights and knowing willingness to subject him to unjust punishment.

196. As a result of Defendants' actions, Mr. Harris experienced extreme stress, anxiety, and emotional trauma.

197. Mr. Harris endured isolation, sleep disruption, and physical hardships inherent in RHU and BOS status.

198. Mr. Harris continues to suffer consequences from having a severe disciplinary infraction on his record.

**Count III – Fourteenth Amendment Procedural Due Process**

**Against Defendants David Czeremcha and Ashleymarie Calderon**

199. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

200. The Fourteenth Amendment's Due Process Clause guarantees fundamental procedural protections in prison disciplinary proceedings.

201. These protections include the right to advance written notice of charges and a fair and impartial hearing.

202. Due process requires the opportunity to present evidence and call witnesses when not unduly hazardous.

203. A disciplinary conviction must be supported by "some evidence" in the record.

204. Mr. Harris was subjected to punitive segregation, an atypical and significant hardship beyond ordinary prison conditions.

205. Lt. Czeremcha ignored clear exculpatory video evidence showing no interaction between Mr. Harris and Officer Calderon.

206. Lt. Czeremcha asserted a narrative contrary to what the video actually showed.

207. The finding of guilt was not supported by "some evidence" as due process requires.

208. Lt. Czeremcha demonstrated bias by refusing to credit multiple staff members' observations favoring Mr. Harris.

209. Lt. Czeremcha injected new justifications not present in the record, specifically alleged "sex noises."

210. Mr. Harris was denied the opportunity to call lieutenants who had reviewed the footage as witnesses.

211. Lt. Czeremcha's reported stance against allowing correctional officers as witnesses exemplifies refusal to permit potentially favorable testimony.

212. The new claim about "sex noises" was introduced at the hearing without prior notice.

213. Mr. Harris had no opportunity to prepare a defense against this unnoticed allegation.

214. Officer Calderon knowingly fabricated false evidence against Mr. Harris.

215. Officer Calderon's false report initiated the process that deprived Mr. Harris of liberty.

216. The intentional fabrication of a disciplinary charge leading to punitive segregation violates substantive due process.

217. As a result of these violations, Mr. Harris was unjustly deprived of his liberty interests.

218. Mr. Harris suffered imposition of a Class A conviction that can affect the length or severity of his incarceration.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Troy Harris respectfully requests that this Court:

A. Award compensatory damages against Defendants, jointly and severally, for violations of constitutional rights including mental anguish, emotional distress, and pain and suffering;

B. Award punitive damages against each Defendant in their individual capacity sufficient to punish their willful and malicious conduct and deter future violations;

C. Issue injunctive relief including: (i) Prohibition against further retaliatory actions by Defendants; (ii) Expungement of the August 2024 disciplinary conviction from Mr. Harris's record; (iii) Restoration of lost good time credits and privileges; (iv) Implementation of appropriate policy changes to prevent misuse of Behavioral Observation Status and ensure due process in disciplinary hearings;

D. Declare that Defendants' actions violated Mr. Harris's rights under the First, Eighth, and Fourteenth Amendments;

E. Award reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

F. Grant such other relief as the Court deems just and proper.

Respectfully submitted,

/s/ Counsel for Plaintiff

PLAINTIFF

By: __/s/__Alexander T. Taubes
Alexander T. Taubes
470 James Street
Suite 007
New Haven, CT 06513
(203) 909-0048
alextt@gmail.com
Juris No.: 437388